UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LAURA GALVAN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   Civil Action No:  SA-04-CV-333-XR |
| | ) |
| SBC PENSION BENEFIT PLAN *et al*., | ) |
| | ) |
| Defendants. | ) |

**ORDER**

Plaintiff brought suit alleging Defendants failed to properly calculate and distribute the correct payment due her as an Alternate Payee under her ex-husband's SBC Pension Benefit Plan (Plan). Specifically, Plaintiff asserts Defendants violated various provisions of the Qualified Domestic Relations Order (QDRO), issued by a Missouri state court in 1995 as part of the divorce decree between Plaintiff and Stanley Davis, her former husband. Plaintiff argues Defendants misconstrued those portions of the QDRO that pertain to the calculation of Plaintiff's Plan benefits in the event Mr. Davis retired early. Plaintiff also claims Defendants failed to provide an accounting upon request, improperly paid Mr. Davis a lump sum payment without her consent, breached fiduciary duties, enacted a series of early retirement windows, and did not timely provide copies of requested Plan-related documents that Plaintiff possessed a legal right to receive.

Defendants filed a Motion for Summary Judgment, arguing the Court should find no genuine issue of material fact as to any of Plaintiff's claims. Having reviewed the briefings and

1

submitted evidence on this Motion, along with the applicable statutory and case law, the Court

ORDERS as follows: Defendants' Motion for Summary Judgment (Docket No. 91) is DENIED

as to Counts I, II, III,  IV, and V of Plaintiff's Second Amended Complaint, and GRANTED as to

Count VI. As for Count VII, it is GRANTED in part and DENIED in part, consistent with the

findings herein.

Based on the Court's Order on the Motion for Summary Judgment in which the Court

finds genuine issues of material fact exist as to the proper calculation of Plaintiff's benefits under

the QDRO, Plaintiff's Motion to Modify the Scheduling Order to file a partial motion for

summary judgment against Defendants and a motion for summary judgment against Mr. Davis is

DENIED (Docket No. 140).

Finally, as to Plaintiff's Motion for Expedited Order Regarding Discovery (Docket No.

145), the Court clarifies that the August 27, 2007 deadline for the completion of discovery does

not prejudice Plaintiff's rights to obtain rulings on the pending discovery motions. If the pending

motions are resolved in favor of Plaintiff, the Court will then consider, upon request, whether

further time is warranted for Plaintiff to conduct such additional, reasonable discovery as may be

appropriate.

**Factual Background**

Plaintiff and Stanley Davis, her former husband, were divorced in Missouri. As part of

the divorce, a Missouri state court entered a QDRO on March 16, 1995 that awarded Plaintiff an

interest in Mr. Davis' benefits under his pension plan. The QDRO prescribes the division of Mr.

Davis' retirement plan between himself, as Participant, and the Plaintiff, as Alternate Payee.

According to the QDRO, the "Court awards, assigns, and grants to Alternate Payee fifty percent

(50%) of Participant's present accrued benefit as of March 16, 1995."[1] In the event, however, that "the Plan provides an early retirement subsidy" to Mr. Davis, the QDRO states that the "Alternate Payee's benefit shall be recomputed to provide Alternate Payee with a proportionate part of such subsidy based on the percentage of the accrued benefit assigned to Alternate Payee hereunder."[2]

In 2000, SBC Communications amended the Plan to create the Enhanced Pension and Retirement Program (EPR). The EPR provided that "five years shall be added to each of age and net credited service for each individual selected to participate in the EPR."[3] The crediting of this additional five years enabled eligible participants, like Mr. Davis, to elect early retirement without incurring a Plan penalty for doing so. The accredited five additional years of service also increased the monthly accrued benefits of these participants. The parties have labeled the first of these benefits as the "Age Service Increase" and the second as "Additional Accruals."

In November 2000, Mr. Davis opted for early retirement, taking advantage of the benefits offered under the newly enacted EPR amendment to the Plan. The EPR entitled Mr. Davis to both the Age Service Increase and the Additional Accruals. After his enhanced benefits were calculated, Mr. Davis opted to receive a lump sum payment of $336,500.79, the total amount due him under the Plan.

After discovering Mr. Davis' election for early retirement, Plaintiff contacted Defendants to request documents pertaining, amongst other things, to the Plan's calculations of Mr. Davis'

---

[1] QDRO, Section II. B.

[2] QDRO, Section II. C.

[3] Human Resources Committee's September 29, 2000 summary of the EPR program at 1.

benefits, as well as her own. Plaintiff specifically laid these requests out in a February 8, 2001 letter.

In response, Defendants informed Plaintiff that the calculation of Mr. Davis' benefits had no bearing on the determination of her own. According to Defendants, while Plaintiff could benefit from the Age Service Increase provided to Mr. Davis, she was not qualified to benefit from the Additional Accruals. After performing the calculation of her benefits pursuant to their interpretation of the QDRO and Plan terms, Defendants concluded that Plaintiff could receive a monthly annuity of $639.61 per month, or a lump sum payout of $106,921.74.

Plaintiff disputes Defendants' interpretation of the QDRO and their subsequent calculation of her benefits, alleging, in part, that they improperly refused to apportion the Additional Accruals between Mr. Davis and herself. Plaintiff also alleges Defendants failed to respond in a timely fashion to her requests for relevant documents which she believes, as a matter of law, she is entitled to receive. After an extended period of communication between the parties failed to resolve their disputes, Plaintiff filed suit on April 20, 2004, seeking relief from this Court.

## Legal Analysis

Summary Judgment Standard of Review

The Federal Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] The party seeking summary judgment bears

---

[4] FED. R. CIV. P. 56(c).

the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[5] Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts to show the existence of a genuine issue for trial.[6] All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes."[7]

Summary judgment is mandated if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial."[8]   In such a situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[9]

<u>Brief Overview of Plaintiff's Claims</u>

In her Second Amended Complaint, Plaintiff organizes her claims into seven counts against Defendants, in addition to a count for court costs and attorneys' fees. Count I contends

---

[5] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[6] *See Id*. at 322-3; Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 585-6 (1986).

[7] Williams v. Time Warner Operation, Inc., 98 F.3d 179, 181 (5th Cir. 1996).

[8] Celotex Corp., 477 U.S. at 322.

[9] *Id*. at 322-3.

that the language of the QDRO plainly states that if the Plan pays Mr. Davis early retirement subsidies, such as the Age Service Increase and the Additional Accruals, then the Plan must pay a proportionate part of these subsidies to Plaintiff.

Count II avers that 29 U.S.C. § 1056(d)(3)(F) prevents the Plan from making a lump sum distribution to Mr. Davis without Plaintiff's consent. Plaintiff argues that absent spousal consent, the Plan's distribution to Mr. Davis is permissible only in the form of a qualified joint and survivor annuity. While Mr. Davis' current wife consented to a lump sum payout, Plaintiff argues that the necessary consent is not the current wife's, but hers, which was never obtained.

Count III asserts that Defendants failed to provide Plaintiff, despite her repeated requests, with an accounting of the value of the early retirement subsidy that the Plan paid to Mr. Davis.

Counts IV and V concern alleged breaches of fiduciary duties. Count IV covers the Plan's purported failure to properly investigate Plaintiff's claim that it overpaid Mr. Davis. Count V focuses on the Plan's lump sum distribution to Mr. Davis without proper consent, which, according to Plaintiff, caused the Plan to lose the value of the survivor annuity to which Plaintiff is entitled under Section II. D of the QDRO.

Count VI deals with how to view and treat the alleged series of early retirement windows adopted by the Plan.

Count VII contends that Defendants failed to provide Plaintiff with requested documentation pertinent to the establishment and operation of the Plan, despite owing legal duties to disclose this documentation within 30 days of request.

Count I

The Court begins with Count I, in which Plaintiff alleges Defendants miscalculated her

benefits by not including a percentage of the Additional Accruals paid to Mr. Davis. The first step in considering this claim is to decide which standard of review to apply.

For the Administrator's interpretation of the Plan, arbitrary and capricious review is correct.[10] For the Administrator's interpretation of the QDRO, however, de novo review is required.[11] The real question then is whether the determination of Plaintiff's rights to the Additional Accruals turns on an interpretation of the Plan or the QDRO. As Plaintiff convincingly shows, it is the QDRO that governs.

In its April 10, 2001 letter to Plaintiff, the SBC QDRO Processing Group explained how, relying on the terms of the QDRO, it calculated Plaintiff's total benefits under the Plan. Furthermore, it is clear throughout the SBC QDRO Team Manager's June 7, 2004 letter to Mr. Davis that both his and Plaintiff's benefits were calculated by relying on and interpreting the governing QDRO. Moreover, shortly before the SBC Benefits Plan Committee met to consider Plaintiff's case, Clause Sisson, Senior Attorney for AT&T Management Services, prepared an internal email discussing Plaintiff's claims. In this September 2004 analysis, Mr. Sisson plainly acknowledges that, for purposes of Count I, the "dispute centers on whether the Additional Accruals are included within the definition of 'early retirement subsidy.'" The phrase "early retirement subsidy" is drawn directly from Section II. C of the QDRO.

As these internal documents evince, Defendants understood that the determination of whether Plaintiff is entitled to the Additional Accruals turns on how the QDRO is interpreted. Because Defendants' interpretation of this document is subject to de novo review, the Court now

---

[10] Dial v. NFL Player Supplemental Disability Plan, 174 F.3d 606, 611 (5th Cir. 1999).

[11] *Id*.

turns to the QDRO to take a fresh look at the meaning of its relevant provisions.

Below are the two provisions, drawn from Sections II. B and C, respectively, that give rise to the conflict in Count I. Section II. B, in pertinent part, reads:

> The Court awards, assigns, and grants to Alternate Payee fifty percent (50%) of Participant's present accrued benefit ***as of*** March 16, 1995.[12]

Were this sentence all that was on point, there would be little basis for controversy. Section II. C, however, muddles matters by stating in the very next paragraph that:

> In the event Participant elects to retire from the Plan prior to normal retirement age and by reason of such early retirement the Plan provides an ***early retirement subsidy***, then Alternate Payee's benefit shall be recomputed to provide Alternate payee with a proportionate part of such subsidy based on the percentage of the accrued benefit assigned to Alternate Payee hereunder.[13]

As an initial matter of interpretation, both parties agree that the terms of the QDRO are governed by Missouri law. To interpret the meaning of the disputed provisions, the Court observes that the "cardinal rule of contract interpretation is to ascertain the parties' intentions and to give effect" to them.[14] Regarding intent, it "is to be determined from the contract alone and not based on extrinsic or parol evidence unless the contract is ambiguous."[15] When interpreting a contract to determine whether it is ambiguous, words "must be given their plain, ordinary meaning."[16] If after giving the words such meaning, the contract is "reasonably open to more than

---

[12] Emphasis added.

[13] Emphasis added.

[14] Care Center of Kansas City v. Horton, 173 S.W.3d 353, 355 (Mo. Ct. App. 2005).

[15] *Id*.

[16] *Id*.

one meaning," then the court should find, as a matter of law, that the contract is ambiguous.[17] If a finding of ambiguity is made, "the court will receive evidence as to the intent of the parties."[18]

Here, the problem term is "early retirement subsidy." Does this subsidy refer only to the Age Service Increase, which both parties agree is included, or giving the words their plain, ordinary meaning, is it reasonable to conclude this subsidy could also encompass the Additional Accruals?

In interpreting the QDRO, it is important to remember the disputed provisions must "be read with reference to the whole."[19] Not only must contracts be interpreted as a whole, they must be considered so as to give "effect to every part if it is fairly possible to do so."[20] As the Missouri Supreme Court recently articulated, "a contract must be construed as a whole so as not to render any terms meaningless, and a construction that gives a reasonable meaning to each phrase and clause and harmonizes all provisions is preferred over a construction that leaves some of the provisions without function or sense."[21]

Here, where confronted with juxtaposed provisions whose relationship to each other is unclear, the Court should begin by considering whether there is a reasonable way to interrelate the two sections. Both parties argue they can rationally relate the sections, but their positions

---

[17] *Id.*

[18] Boswell v. Steel Haulers, Inc., 670 S.W.2d 906, 914 (Mo. Ct. App. 1984).

[19] 11 Williston on Contracts § 32:5 (4th ed.).

[20] Ott v. Pickard, 237 S.W.2d 109, 111 (Mo. 1951).

[21] State ex. rel. Riverside Pipeline Co. v. Public Service Commission of State, 215 S.W.3d 76, 84 (Mo. 2007).

differ as to how this should be done.

Defendants assert the proper valuation date for Plaintiff's benefits is March 16, 1995, the date provided in Section II. B. The provision that follows referencing an early retirement subsidy does not alter the valuation date, they argue; rather, it simply gives Plaintiff the benefit of the Age Service Increase provided to the Participant so that Plaintiff's entitlement in II. B is not reduced by the otherwise applicable early retirement penalties.

As textual support for their argument, Defendants focus on the last part of II. C, which concludes with the phrase, "based on the percentage of the ***accrued benefit*** assigned to Alternate Payee hereunder."[22] They argue that Plaintiff's accrued benefit was determined as of March 16, 1995, and therefore, the reference earlier in that same sentence to an early retirement subsidy could not have been meant to alter the valuation date of Plaintiff's benefits.

Plaintiff contests this interpretation, arguing the more reasonable understanding of the relevant sections is that the early retirement subsidy referred to in II. C covers not only the Age Service Increase, but also the Additional Accruals. Plaintiff points to a series of Missouri cases to support her position that the QDRO adopts a "wait-and-see" formula, meaning the valuation of Plaintiff's benefits, in the event of Participant's early retirement, should not be conducted until the date of retirement.

Returning to Defendants' textual argument, the problem is that the meaning of the last part of paragraph II. C depends on which word(s) you emphasize. Is the focus on the "*accrued benefit*" or on the "*percentage* of the accrued benefit"? If the former, then Defendants appear to prevail, as the accrued benefit was determined at divorce, not retirement, and so should be

_____

[22] Emphasis added.

unaffected by the Additional Accruals. If the latter, then all that's being said is that the early retirement subsidies should be apportioned according to the same percentage (here 50%) as the accrued benefit was, meaning the Additional Accruals, which refer to value added after the divorce, could be included in the total calculation of Plaintiff's benefits. Either reading is reasonable, and the text of the QDRO, by itself, does not command one over the other.

As a practical matter, Defendants suggest that under the QDRO, the only situation in which Plaintiff could claim entitlement to post-divorce accruals is in the event Mr. Davis retired early. If Mr. Davis had simply worked the extra five years and then retired, there does not appear to be language in the QDRO that could entitle Plaintiff to anything more than the value of her benefits as of March 16, 1995. This would be an odd result, Defendants say, suggesting the QDRO should not be interpreted according to Plaintiff's reading.

While a persuasive practical argument, Defendants' observation does not eviscerate the ambiguity. The parties may have had a legitimate reason for setting up the QDRO this way. At this stage, the Court's power is limited to determining whether the QDRO can be reasonably interpreted more than one way by reference to the text alone. While Defendants' practical argument strengthens their interpretation, their argument is really directed at how to resolve the ambiguity, not whether the text alone creates such an ambiguity. Once an ambiguity is found, the issue of resolving it is one of fact, permitting consideration of evidence beyond the text, including practical arguments that attempt to show what the parties meant when they opted for certain language or provisions. Because Defendants' argument strays beyond the text of the QDRO, it must be considered outside the summary judgment setting.

The final step in deciding whether Plaintiff's reading of the QDRO is reasonable is to

examine whether Missouri law permits an alternate payee to receive a post-divorce valuation of the benefits she is due under her former spouse's retirement plan. On this issue, Plaintiff directs the Court's attention to the cases of *Kuchta v. Kuchta*,[23] *Lynch v. Lynch*,[24] and *Ward v. Ward*[25] to show that Missouri law permits her reading of the QDRO.[26]

In *Kuchta*, the Missouri Supreme Court stated "a pension is not earned on the last day of employment prior to retirement, but is a form of deferred compensation which is attributable to the entire period in which it was accumulated."[27] Building on this logic, the Missouri Court of Appeals in *Lynch* recognized a "wait-and-see approach to dividing the marital property in the husband's pension plan."[28] The court permitted the former spouse to share in the increased retirement benefits that resulted from the husband's continued employment after the marital dissolution, reasoning that the "higher retirement benefits that may be realized by the husband by continued employment after the dissolution are made possible, in part, by his years of employment during the marriage."[29]

In *Ward*, the court rejected an effort by Mr. Ward to amend the QDRO to ensure his

---

[23] 636 S.W.2d 663 (Mo. 1982).

[24] 665 S.W.2d 20 (Mo. Ct. App. 1983).

[25] 34 S.W.3d 288 (Mo. Ct. App. 2000).

[26] Outside Missouri, at least one other state court examining a QDRO similar to this one adopted an interpretation of the QDRO's provisions favorable to Plaintiff. *See* Reed v. Reed, 2001 WL 127873 (Ohio Ct. App. 2001).

[27] 636 S.W.2d at 665.

[28] 665 S.W.2d at 23.

[29] *Id*. at 24.

former spouse could not benefit from his post-dissolution employment. Citing *Lynch*, the appellate court found that the trial court had supportable grounds for concluding that the QDRO in dispute valued Ms. Ward's interests not only at the time of dissolution, but also at the occurrence of Mr. Ward's retirement.

These cases support the proposition that the Missouri court that approved the QDRO in this case *could have* provided for a valuation of Plaintiff's interest in the pension plan at Mr. Davis' retirement, even though that event occurred post-divorce. At the same time, in her briefs, Plaintiff acknowledges Missouri courts also have the power to employ a fixed payout approach that values benefits solely as of the time of divorce. The result is that while Missouri law permitted the court in this case to approve a QDRO that aligns with Plaintiff's position, it also provided the court with the flexibility to fashion a QDRO that comports with Defendants' position. Determining which method of valuation the Missouri divorce court opted for here, however, cannot be done as a matter of law because of the ambiguity in the language of the QDRO. Therefore, the Court must "resort to extrinsic evidence" to determine the actual intent of the parties.[30]

Simply put, the QDRO is confusing. Section II. B seems clear cut. Left by itself, there is little ambiguity. When read, however, in conjunction with the rest of the QDRO, as must be done, clarity vanishes. The relationship between Sections II. B and C is perplexing. It is clear that the latter provision is meant to somehow clarify or alter the former. The text alone does not, however, transparently indicate what specifically is referred to by "early retirement subsidy." Is it possible this subsidy extends no further than the Age Service Increase? Perhaps. Is it possible

---

[30] *Boswell*, 670 S.W.2d at 914.

this subsidy extends beyond the Age Service Increase to the Additional Accruals? Possibly. Is there anything in the text of the QDRO that compels one conclusion over the other, or strips either conclusion of reasonableness, as a matter of law? No.

As a result, the Court finds there is a genuine issue of material fact as to Count I, and thus, Defendants' summary judgment request as to that Count is denied.

Count IV

The Court turns next to Count IV, in which Plaintiff asserts a breach of fiduciary duty claim related to the substance of Count I. The parties dispute whether this fiduciary claim is actually a disguised benefits claim. The essence of the argument articulated by Plaintiff for why the two are distinguishable is that the fiduciary claim seeks relief *on behalf* of the Plan, not *from* the Plan. Additionally, in what is a factually intensive issue, Plaintiff argues that Defendants failed to properly investigate her claim, which, if it had been diligently pursued, would have alerted them that the Plan incorrectly distributed to Mr. Davis benefits that were properly payable only to her.

Because of the tightly interconnected relationship between Counts I and IV, and because of the factually intensive nature of the failure to investigate claim, the Court finds it premature to rule on Plaintiff's Count IV at this time.

Count II

In Count II, Plaintiff takes issue with the Plan's payment of a lump sum to Mr. Davis without her consent. Plaintiff contends that 29 U.S.C. § 1055 requires that, absent spousal consent, the only distribution the Plan can make to Mr. Davis is in the form of a qualified joint and survivor annuity. Citing 29 U.S.C. § 1056(d)(3)(F), Plaintiff argues that the spousal consent

14

required in this case is hers, as the former spouse, not the current wife's. Because the Plan made

its lump sum payment to Mr. Davis based on the consent of his current spouse, the Plan, so the

argument goes, paid Mr. Davis the value of the survivor annuity which should have been retained

and paid to Plaintiff upon the death of Mr. Davis.

Defendants do not contest that spousal consent was necessary for a lump sum payout.

Their dispute is with which spouse's consent was required, arguing the consent had to be from

the current spouse, not the former one.

The key statutory language comes from 29 U.S.C. § 1056(d)(3)(F), which reads:

> ***To the extent provided in any qualified domestic relations order***, the former
> spouse of a participant shall be treated as a surviving spouse of such participant
> for purposes of section 1055 of this title (and any spouse of the participant shall
> not be treated as a spouse of the participant for such purposes).[31]

While § 1055(c)(2)(A)(i) does require spousal consent in order for a Participant to elect a

lump sum payment, the afore-cited section of 1056 substitutes the former spouse for the current

spouse *only* to the extent provided in the QDRO. Hence, our inquiry again centers on the

language of that Order.

Plaintiff focuses the Court's attention on provision II. D, which reads:

> The provisions of the Plan or of the law governing the operation of the Plans [sic]
> which provide benefits to the surviving spouse of a deceased participant ***shall apply
> in favor of the Alternate Payee until the benefits hereby assigned to Alternate
> Payee have been fully paid to Alternate Payee*** provided, however, that said
> survivor's benefit shall not be less than the value of the pre-retirement survivor
> benefit hereby assigned to Alternate Payee.[32]

By denying Defendants' request for summary judgment on Count I, the Court has not yet

---

[31] Emphasis added.

[32] Emphasis added.

ruled on whether Plaintiff received the full value of the benefits assigned to her under Sections II. C and D of the QDRO. Therefore, the possibility remains that Defendants miscalculated what Plaintiff is due, and thus, the benefits assigned to Plaintiff under the QDRO may not have been fully paid yet. Because, according to paragraph II. D, full payment to the Plaintiff is a prerequisite for transferring benefits back to the current spouse, then until it has been determined whether full payment was made, the Court cannot dispositively rule whether Plaintiff's or the current wife's consent was required for Mr. Davis to receive a lump sum payment.

As a result, the Court denies Defendants' request for summary judgment as to Count II.

Count V

Count V is a fiduciary claim tightly interwoven with Count II. Like with Count IV, until the Court reaches the merits of the interwoven claim, and until the Court can fully consider the factual and evidentiary support for Plaintiff's assertion that Defendants failed to properly investigate her claim, it cannot reach a final conclusion as to Count V.

Count III

Turning to Count III, Plaintiff avers Defendants repeatedly denied her request for an accounting of the value of the early retirement subsidy paid to Mr. Davis, as well as any and all correspondence regarding the EPR offer and its acceptance by Mr. Davis.

Plaintiff further argues that she subpoenaed the requested documentation, pursuant to Defendants' demand, but never received what she sought. As a matter of law, it seems unconvincing to argue, as Defendants do, that Plaintiff has no right, as Alternate Payee, to the documents by which she claims her benefits should be calculated. Even if she is wrong about the Additional Accruals, it is still true that a QDRO can only award an Alternate Payee benefits that are first payable to the

Participant. Therefore, for the Alternate Payee to calculate her own benefits, she must have access to information on how the Participant's benefits were determined. Because such information was not timely provided, Plaintiff's Count III survives Defendants' summary judgment motion.

Count VI

In Count VI, Plaintiff alleges Defendants amended the Plan to provide a series of early retirement windows. Because of the nature and frequency of these amendments, Plaintiff argues they should be construed as permanent, not temporary, Plan benefits.

Defendants assert that the series of one-time early retirement windows offered over a period of years does not constitute a permanent, protected benefit under ERISA. Furthermore, according to Defendants, "there is not a shred of evidence to support any inference that the early retirement windows under the Plan were impermissible in any manner."[33]

Fifth Circuit case law holds that a "defendant moving for summary judgment can rely on the absence of evidence" to support a summary judgment motion.[34] Furthermore, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."[35]

Plaintiff fails to provide sufficient evidentiary support to create a genuine issue of material fact. Instead, Plaintiff's claim appears to be pled out of caution, pursuant to the proverbial "keeping all doors open" approach, in the event evidence later comes to light substantiating the claim. While

---

[33] Defendants' Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 18.

[34] International Association of Machinists v. Intercontinental Manufacturing Co., 812 F.2d 219, 222 (5th Cir. 1987).

[35] Anderson v. Liberty Lobby, Inc., 477 US 242, 248 (1986).

17

perhaps an acceptable approach at the pre-discovery outset of a case, it is no longer permissible at this late stage of litigation. Accordingly, Defendants' request for summary judgment as to Count VI is granted.

<u>Count VII</u>

Finally, in Count VII Plaintiff asserts that Defendants failed to provide Plan documents in a timely fashion. In her pleadings, Plaintiff avers she requested a copy of the offer accepted by Mr. Davis, the information and numbers used to compute Mr. Davis' benefits, any and all correspondence regarding the EPR offer, the information and numbers used to compute her benefits, and any and all information and data regarding the effect of Mr. Davis' early retirement on the amount she is entitled to receive. Plaintiff also claims she effectively requested a copy of the EPR program. Plaintiff summarizes these requests, made in a February 8, 2001 letter to the Plan's Administrator, as a "request for instruments under which the Plan is established or operated."[36]

How these document requests are characterized is important because the Plan Administrator is required, upon the request of "any participant or beneficiary, [to] furnish a copy of the . . . instruments under which the plan is established or operated."[37] An Administrator who fails to provide the requested documentation within 30 days of the request "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day."[38]

Additionally, 29 C.F.R. § 2560.503-1 requires the Plan Administrator to provide all "information relevant to the claimant's claims for benefits," which includes information "relied upon

---

[36] Plaintiff's Second Amended Complaint at 16.

[37] 29 U.S.C. § 1024(b)(4).

[38] 29 U.S.C. § 1132(c)(1).

in making the benefit determination."[39]

Before proceeding further,  29 U.S.C. § 1024(b)(4), 29 U.S.C. § 1132(c)(1), and 29 C.F.R. § 2560.503-1 all make clear that the responsibility to provide the requested documentation sought by Plaintiff lies with the Plan Administrator. Thus, to the extent Plaintiff's Count VII claims extend to Defendants other than the Plan Administrator, summary judgment is granted in those Defendants' favor.

Under 29 C.F.R. § 2560.503-1, Plaintiff clearly seems entitled to any documents relevant to the calculation of her benefits. As noted in the Count III analysis, to determine what Plaintiff, as Alternate Payee, is entitled to under the Plan, recourse to information pertaining to the calculations of the Participant's benefits is required. Accordingly, Plaintiff's requests for such information is supportable by law, and therefore, Defendants' summary judgment motion as to any information pertaining to the calculations of either the Participant's or Alternate Payee's benefits is denied.

Turning to the EPR report, the parties dispute whether Plaintiff requested this document in her February 8, 2001 letter. Plaintiff argues that her letter gave notice to the Plan Administrator that she wanted a copy of the report, even if the letter never referenced the report by its proper title. Defendants respond that Plaintiff's letter could not be fairly construed to constitute a request for the EPR report or any other documents covered under 29 U.S.C. § 1024(b)(4).

 Defendants' argument, however, is undermined by their own internal documentation. The SBC QDRO Processing Group's June 27, 2003 letter, written in response to Plaintiff's February 8, 2001 requests, clearly evidences that Defendants understood that Plaintiff's requests concerned the EPR. Furthermore, according to Plaintiffs, on June 27, 2003, Defendants first provided Plaintiff with

---

[39] 29 C.F.R. § 2560.503-1 (j)(3) and (m)(8).

a copy of the EPR report, despite the fact that it is a document under "which the plan is established or operated,"[40] and thus, required to be provided within 30 days of request.[41] If Plaintiff is correct about the timing, which does not appear to be challenged by Defendants, then despite their 30 day legal obligation, the Plan Administrator failed to provide Plaintiff with the EPR report from February 8, 2001 until June 27, 2003. Thus, Defendants' summary judgment request on the EPR report is denied.

Finally, the parties dispute whether the Plan Administrator timely provided Plaintiff with a correct copy of the Plan document. It is the position of Defendants that Plaintiff's first request for this document came in a letter dated January 28, 2004, pursuant to which, the Plan Administrator responded by providing the document within the mandatory 30 day window. Plaintiff seems to concede that Defendants replied with a Plan document within 30 days, but disputes it was the correct Plan document. In particular, Plaintiff alleges neither the cash balance provisions nor the grandfather provisions were included in the copy of the Plan sent to her.

The evidence, however, points to the contrary. Plaintiff's own disclosure reveals that the cash balance and grandfather provisions were provided to her.[42] Furthermore, while Plaintiff bases her argument on the fact that her copy of the Plan differed from the working copy sent in 2002 to the IRS, no evidence is provided to substantiate either that the working copy was the then operative version or that Plaintiff was harmed by any differences that might have existed between the two versions. To the contrary, Defendants submitted an affidavit by Claude Sisson, Senior Attorney for

---

[40]  29 U.S.C. § 1024(b)(4).

[41] 29 U.S.C. § 1132(c)(1).

[42] PLF 485 - 504.

20

AT&T Management Services, stating both that "the copy of the Plan Plaintiff received . . . was the then-effective document . . . [and] Plaintiff would have had no greater nor lesser rights under the restated Plan document than she had under the then-effective document." Therefore, the Court finds there is no material dispute to sustain Plaintiff's claim that she was provided with an inappropriate version of the Plan.

In sum, on Count VII, the Court grants summary judgment as to the improper Plan document claim, as well as to the rest of the claims for all Defendants but the Plan Administrator. With respect to the Plan Administrator, the Court denies summary judgment on Plaintiff's claims pertaining to her requests for the EPR report and the documents concerning the calculation and distribution of Plan benefits for her and Mr. Davis.

**Conclusion**

The Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment (Docket No. 91). Summary judgment is granted as to Plaintiff's Count VI and as to that part of Count VII pertaining to Defendants' duty to provide the correct version of the Plan document, as well as to the claims brought against Defendants other than the Plan Administrator. Summary judgment is denied as to Counts I, II, III, IV, V, and the remainder of Count VII.

Plaintiff's Motion to Modify the Scheduling Order is DENIED (Docket No. 140).

As for Plaintiff's Motion for Expedited Order Regarding Discovery (Docket No. 145), the Court clarifies that the August 27, 2007 deadline for the completion of discovery does not prejudice Plaintiff's rights to obtain rulings on the pending discovery motions. If the pending motions are resolved in favor of Plaintiff, the Court will then consider, upon request, whether further time is warranted for Plaintiff to conduct such additional, reasonable discovery as may be appropriate.

It is so ORDERED.

SIGNED this 1 day of October, 2007.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE